The complaint which was supported by a declaration from a company insider, Mr. Stepanovich, said that First American had embarked on a national scheme of paying large amounts of money for exclusive referral agreements from title companies all around the country. We call this the national scheme. Mr. Stepanovich's declaration, which is pages 68 to 73 of the record, said that First American had a goal that was the same in every case, that it followed the same protocol, that this was done as a matter of corporate policy, that First American was interested only in acquiring the increased premiums generated by the exclusive referral agreement, and that it used a standard process towards one primary objective. Now, this primary objective is exactly what Congress was concerned about in 1974 and also in hearings in 2006. It's the very kind of reverse competition that is paying for referrals, bribes, kickbacks, and referral fees. Counsel, the question isn't necessarily whether your client, I mean, I guess there is a question whether your client alone can bring the action, but in terms of the certification question, our standard of review is extremely deferential. In terms of the certification, would you explain to me why there is a significant abuse of the trial court's discretion in denying class certification? I do have to disagree a little bit on the standard here. In general, the standard is abuse of discretion, but this Court has always said, even in Zinsser v. Acufix and before Yokoyama, which is the current decision, that when you make an error of law, that is per se abuse of discretion. If you look at the decisions that the trial court made here, all but one of them is actually, or perhaps two on the outside, all but one or two of them are errors of law. The first error of law was to say that we had to prove an overpayment by First America. That's a classic mistake of law. What does RESTWR require? A second error of law by the district court was to say that we had to prove individual referrals in every case. Again, an error of law under Yokoyama, but even under the cases before Yokoyama, when you make an error of law, per se abuse of discretion. The only parts of the district court's holding that could be considered discretionary, therefore subject to this deferential review standard, are the district court's conclusion that it didn't have enough evidence to say who is in the class and how much do they pay for title insurance, even though it had these HUD-1 settlement statements, even though there were electronic records at First America and at the title companies. In that case, it was an abuse of discretion because the evidence was, I just want to suggest, as plain as a pike staff, that you could use these records in order to determine who is in the class. So, I guess my answer is, depending on the issue, there is a different level of review. Doesn't there have to be a demonstration, though, that there was, in fact, a referral in each case? No, I don't think there does. If we take a look at Section 2607, Section 8 of RESTWR, 2607A, sometimes called Section 8A, says that a violation of the statute consists of the when you give somebody a fee, a kickback, or a thing of value. That's expansively described. It could be a lottery ticket, a HUD incentive, it could be anything like that. And in exchange for that, there is an agreement or an understanding that business shall be referred to in person. In other words, the exchange of money for the agreement that in the future business will be referred. That constitutes a violation. The next step is, well, who can sue for that violation? Then you move to 2607D2. And that says that any person who violates the prohibition is liable to the person charged for the settlement service involved in the violation in an amount equal to three times the amount of the money that was paid for such settlement service. The person charged for the violation is the person charged for the settlement service. The service involved in the violation is the person charged for the settlement service. But that's, I guess, my, that's exactly the question I was asking you. Wouldn't you have to determine that the individuals didn't shop, didn't ask around independently and make their own decision about where to get the title insurance? Well, let me answer that as a matter of fact and then go back to the matter of law point. As a matter of fact, according to the testimony from the First American's corporate representative at deposition, they said that typically it is the title company who selects the title insurer. And you might have a once in a blue moon exception. There might be one bank in a thousand that might insist on First American. There might be one customer in a million who absolutely has to have First American. Those individuals could be screened out through class discovery or at the remedy stage. But as a general matter, it's referrals by the title company. And Mr. Panovich's declaration is very clear on this. Insist that there be an exclusive referral agreement when it pays money to these title companies for the referrals. So as a matter of fact, we think it's established. How does a title company decide the referral? Well, if you're a company like Tower City... Say I go to an escrow company and I want to buy a piece of property and I tell the other party. The other party uses that escrow company. And of course the other party is going to decide on the title policy. And so the person that's going to suggest the title policy is probably going to be the escrow holder. How does a title company get into... The answer is that people typically get referred to title companies. Title companies are typically the agents for a title underwriter. And if you're a company like Tower City, which is the one we have discovery about, then the agency agreement, this is at page 132 of the record, says... And this is what First American insisted on when they paid the $2 million. They say, you're appointed our agent and agent agrees to promote and perform exclusively for First American in all counties in Ohio. So the answer is that once you get there, if there's one of these referral agreements, you will be sent to First American with de permissions if there's that occasional lender that requires that some other party be used. So that's how... You've got an Ohio company, so what are you doing here? We sent it here because First American was here because we had powerful evidence from Mr. Stepanovich and others that this Tower City example is typical, it's common, and it is similar to other agreements around the country. Mr. Stepanovich... Most places in the country, lawyers do the title searches. Right? That may be. We're only talking about title companies where First American actually purchased a minority state and as part of that purchase insisted upon, which is what they did here with Tower City, insisted that there be an exclusive referral agreement or any kind of referral agreement and paid money for it, $2 million in this case. If there are instances where First American didn't buy that interest, they're not part of the class. But according to Mr. Stepanovich's declaration, he was personally aware of five or six around the country, including Tower City, and he also knew from speaking to the president of the company and from other senior executives that this was a common practice, a similar protocol, and done across the board. So that's how we know that it's out there and that's how we know that Tower City is just one of several. First American submitted declarations to the district court, although it refused to give us any discovery, that said, oh, well, we have as many as 180 similar deals around the country where we have purchased minority states and title companies and we have, they never expressly denied the fact that they had also, for the millions of dollars they paid for those minority states, that they had also obtained referral agreements, exclusive referral agreements like the one with Tower City. They said that the deals vary in certain ways and the district court picked up on that and said, well, the amount of money they may have paid, other terms of the agreement may have varied. And it's always easy to vary those terms, okay, but those variations are irrelevant as a matter of law. The issue is under Section 8A, did they pay money and did they get back an agreement that services shall be referred? Once you've done that, you've satisfied the rest, but there is a violation. Then you move, as I was saying a moment ago, Judge Graber, you move to 2607D2, which says the person who has paid for settlement services, okay, when there's been a violation, is entitled to treble damages. And the reason that that is true is because Congress recognized that people don't shop, that people are referred by title companies. Again, that's the testimony from Kristen. It's not really treble damages. Isn't it treble the amount that they paid? Correct. And the reason I sort of am making that distinction is that in a sense, the person may not have suffered damages in the normal sense of the word, that they may have gotten value and not paid any more than they would have paid in an open market. Nevertheless, statutorily, they get three times what they paid. Okay, so it's – am I right in understanding that? It's statutory damages that are measured at three times what you paid. And the reason is, the reason is because Congress recognized, and it's in the findings at the beginning of the statute in 2601, that there is a widespread anti-competitive conduct in this industry. There are bribes. There are kickbacks. There is reverse competition. And so Congress said that we need to root out these practices. We're not going to control the prices. We need to root out the conduct, like paying for exclusive referrals. That's why Congress created the statute, because it's true, as you say, that you can't prove the change in prices in any individual case. That's why you have to attack the structure of the problem. That's what RESPA does. That's what Section 8A does. And that's the situation we have here. I just want to note one thing more about Section B3, Rule 23B3, and then I'll reserve the balance of my time. The issue here is not whether every single issue is common to the entire class. The issue under a local joint executive board, the issue under Hanlon, the 1998 decision on the support, is whether common issues form a substantial part or a significant part of the issues in the case. And it's clear that that is true here, because First American, by its own admission, had multiple agreements that had these referral agreements there. And by their admission, they paid money, an indivisible amount of money, that included a promise for referrals. That's an express violation of Section 8A. Thank you. Thank you. Did you ever diagram this case? I'm sorry. Do I have a diagram? Did you ever diagram it? I don't. I think I may have informally. I don't think we submitted one. You don't know what I'm talking about? I'm afraid I don't, Your Honor. Okay. That's all right. But I'm happy to be educated. You can make a diagram of the case, you know. You know what I'm talking about? A diagram. Put it on one page, you know, like this, so you can understand it. It takes a lot of time to do it. It takes a lot of time to keep it all focused. You know, now words here, words there, this happened, that happened. Yes, sir. Diagram. It's a fair request. One of the great lawyers on this court is Steve Trott. Always diagram your case. Okay. I appreciate it. Thank you, Your Honor. The first guy I worked for, the last guy I ever worked for, he thought I was useful. He made fun of me because I diagrammed cases. For that and other reasons, which I will not explain, he did me a great favor, because I never worked for another person again in my life. That helps to keep the message consistent, too. Learn to diagram your case. What if you had to show it to a jury? I haven't explained it to them. Haven't had the chance. The New York Times, look at the New York Times. How they diagram complicated things. Well, can I tell you, we actually do have one little diagram in our brief, and I'm happy to draw your attention to it if you like. Yeah, yeah. Maybe we could hear from the other counsel at this point. May it please the Court, I'm Richard Zuckerman. I represent First American. With me at counsel's table are Charles Newman and Michael Duvall. Judge Ferguson, I don't have a one-page diagram, but I think I have a two-page diagram, so maybe that will suffice. And the two pages that I'd like to refer the Court to are the HUD one, for Ms. Edwards' purchase of a home for which title insurance was issued. They're in the record, starting at page excerpts of records 516 through 519. And it's actually just the two pages, 517 and 518, that are critical. If the Court would like, I have extra copies that I can hand out, but it is in the record before the Court. And the diagram that Mr. Smith would... I have that. The diagram that Mr. Smith was referring to comes from page two of Ms. Edwards' HUD one, and they reproduced that as a diagram in their brief. And what that is is a statement that purports to show who paid for the title insurance of Ms. Edwards' purchase. And that was offered by the appellants to show that, in fact, this was an easy issue to determine, and as Mr. Smith stated in oral argument, it's something that the HUD one settlement statement showed. And what it says on page two, and that's line 1108, is under the paid from borrower's funds column, it has $455. And under the paid from seller's funds at settlement, it has $273. But what was not shown in Mr. Smith's brief before this Court is that on page one of the settlement agreement, which is page 517 of the record, on lines 213 under the borrower's transaction, and 513 under the seller's transaction, it says seller paid closing costs $6,660. So what happened in this specific transaction is that while there was a split, $450 approximately, $270 approximately, that was then wiped out by the seller, who's not a party to this case, paying a lump sum of $6,660, which covered almost all of the buyer's closing costs. So if the issue, if this were just Ms. Edwards' case and not a proposed class action, one couldn't even tell who paid the closing costs from this HUD one. Is that an essential that she paid it for anything? It is absolutely essential because RESPA speaks of the claim as being the person charged and paid for the closing costs. So, and the plaintiff acknowledges, the plaintiff purports to represent both the buyers and the sellers in every transaction in this class. And indeed, in plaintiff's brief before this court, there's a statement that the seller, who is Mr. Watson, who sold to Ms. Edwards, is also a member of the class. But between Mr. Watson and Ms. Edwards, this HUD one shows that there would be a factual dispute, or could be a factual dispute, as to who paid the closing costs, who would be a member of the class, if either of them, and who would have the claim and what the amount of the claim would be. As I understand, the purpose of the statute is to prevent kickbacks or agreements where you get exclusive rights to use a particular insurance company? Is that the purpose of the statute, is to prevent that? The purpose of the statute, that is one purpose of the statute. One purpose of the statute is to disclose costs. That's the reason for the HUD one. Another purpose of the statute. But that's not what is at issue here. It's the kickback aspect. Well, actually, as plaintiff pleads her case, what she says in articulating how she claims she was damaged, is she says she was denied information about closing costs. In fact, the HUD one shows that she had all of the information about closing costs. That's why I suggested that it's related. But Your Honor is correct. A principal purpose of the statute is to prevent kickbacks. And that is one of the reasons why, when Congress amended the statute in 1983, Congress recognized that there were many transactions where there was no damage sustained. As in Ms. Edwards' transaction, there was no damage sustained. So Congress created criminal remedies, which were part of RESPA originally, the first mechanism of enforcement. Enforcement by HUD through injunctive relief, which was added in 1983. Enforcement by state insurance commissioners, also added in 1983. Enforcement by state attorney general, also added in 1983. And private causes of action by, we maintain, persons who have been damaged, not persons who sustained no damage. Well, is the damage the fact that she didn't have any say in the choice of the insurance company? The damage, the only – we don't believe that any damage has been sustained, Your Honor. That could be a damage. We would suggest not, Your Honor. And the reason we would suggest not is that this is an economic transaction. This is not an action like havens which invite invidious racial discrimination. Well, but the quality of your policy can be at issue. There is no claim whatsoever that the policy was deficient. Well, the statute, though, sets up – the reason I questioned opposing counsel was that the statute defines damage in this context as what you paid for the settlement services. It doesn't require that you pay too much or that you paid for lousier title insurance. It simply requires that you have paid for services that are under the cloud of the improper behavior  So why, in that statutory sense, didn't Ms. Edwards suffer statutory damage? Well, Ms. Edwards, if that is – we maintain that the statute doesn't provide that. I understand that. But if the statute is held by this court to some provide, and if the statute is then meets Article III standards, which is also an issue before this court, then Ms. Edwards would have to show that she paid something for her policy. And based upon this HUD-1, this isn't enough to show that. We would need the testimony of Mr. Watson and we would need the testimony of Ms. Edwards as to how that $6,660 lump sum payment by Mr. Watson to Ms. Edwards was allocated and whether that, in fact, meant that Mr. Watson paid for your policy. I understand your position. If I may move you to the next question down the road, and assuming that Ms. Edwards has suffered statutory damage, why do not common questions of law or fact predominate in this case? It doesn't have to be both. It can be a common question of law or fact that predominates. Let me just illustrate two of the other areas where the common questions, where there are individualized questions that predominate over any common questions. First, was there a referral? This is an issue, a question that Your Honor posed to Mr. Smith. A referral, if one adopts HUD's definition, means that the Tower City or whatever the title agency was had to affirmatively influence the choice of First American. Now, that means that if the lender said, I want a First American policy, they're outside the class because there was no, they don't need a restful claim because there was no affirmative influence. Well, then if they're outside the class, we don't have to decide whether they are common. I misspoke on that, Your Honor. It's not outside the class. As Ms. Edwards purports to define a class, it's everyone who purchased through Tower City or on a nationwide class, everyone who purchased through any of the agencies in which First American had an interest. But if in fact what one would need to do is go through each one of those transactions to determine whether as to each buyer and each seller, the selection of the title insurance company was affirmatively influenced. The lender might select a First American policy. The lender might choose the title agency, knowing that the title agency would provide a First American policy. You might have a situation where a seller bought the house relatively recently and had obtained a First American policy at that time and wanted to go back to the same title company, both because of satisfaction of the services and because it makes it easier to do a successive title policy. All of those are individual issues as to whether a referral took place that are laid on top of the individual issues as to who on each individual transaction paid for the title insurance and therefore who would have the right to make the claim. And as between a buyer and seller, and Ms. Edwards proposed that both buyer and seller be members of the same class, their interests are antagonistic. The reason why I suggest that it is necessarily so, in each individual transaction, suppose that $1,000 was paid for title insurance. And suppose, although this is not our view of the statute, that the remedy was for three times $1,000, $3,000 claim.  It gets whacked up between the buyer and the seller. If the buyer paid the full $1,000, the buyer has a $3,000 claim. If the seller paid the full $1,000, the seller has a $3,000 claim. That's just a mechanical question, though. It's not a conflict of interest in the normal sense. It's no more than saying that if one class member paid $1,000 and one paid $700, that they have a conflict because one's going to get more dollars. The reason I do suggest it's a conflict, Your Honor, is that it's between the buyer and the seller. It's a zero-sum game. If Mr. Walton... Well, I know, but it's not really in the sense that somebody paid it, and it's a knowable fact who paid it. But that fact has to be established. Well, that's a different question than whether the two people have a conflict in the legal sense of a conflict. That fact has to be established through an individualized inquiry for each transaction. Well, you can do that by sending out a questionnaire. And what do you do, Your Honor, in this instance, if Mr. Walton comes back and he says, I paid the entire title insurance cost, and the way I paid that entire title insurance cost is through this $6,660 credit that I gave to Ms. Edwards. And Ms. Edwards comes in and says, oh, no, I paid the $450. But that's kind of beside the point. We want to know whether this referral was required by the agreement between Tower and the insurance company. And the answer is that it was not. Well, that's a different issue, so I don't know why you're arguing about between the buyer and the seller. The answer is that the— Well, what you're trying to show is that this is—that each of these is really an individual claim and it is not amenable to a class action. And it shouldn't be treated as a class action. Exactly correct, Your Honor. Well, it's not hard to figure out. Let me respond briefly to one other issue, which relates— You can hear that same argument on any class action. Let me respond briefly to one other issue that Mr. Smith addressed, where he argued that the district judge made an error in law by saying that with respect to its transactions with the title agencies, that First American had to—that he had to show, that the plaintiff would have to show that they overpaid for their interest in the title agency. There's a very clear place where Judge Otero got that idea. He got it from the plaintiff's complaint. That's the claim that the plaintiff pled. That's what the plaintiff said the legal standard was. The complaint says in paragraph 16, in setting forth the basis for plaintiff's claim, quote, the purchase price for the minority interest was significantly more than the book value, unquote, of Tara Zittler. Paragraph 18, First American, quote, received only nominal profit distributions, unquote. Paragraph 18 states that First American didn't play an active enough role in management and that showed that it wasn't really interested in its equity interest. So the entire notion of overpayment and saying that when you had a transaction where First American acquired a minority interest in a title agency, it had to be evaluated as to whether they paid too much and therefore it was a disguised kickback, did not originate with Judge Otero. That is exactly how it was pled in the complaint. And when a district judge applies the theory of the case as pled by the plaintiff and on that basis, and we suggest that it's also a correct statement of the law, but on that basis says that this issue shows that there are individualized issues with respect to each of the 180 title agencies, if there were to be any possibility of a nationwide class, it will behoove the plaintiff to come before this Court and say, oh, the district judge made an error of law. It wasn't an error of law. And if it was, it was an error that the plaintiff invited by pleading the case exactly that way. Thank you, Your Honor. Thank you. Let me first just direct the Court to page 26 of the appellate's brief, which in a very summary way has the sort of diagram that you were talking about. It explains the transaction that was engaged in here where First American paid $2 million in this case, different amounts in other cases, but what they got back in addition to stock was the agreement to refer exclusively business to First American. That's a prima facie and a facial violation of Section 8A of RESPA. That's what the case is about. We've cited in our brief the GAO reports from 2006, 2007, which tell you that this is an ongoing problem just like in 1974, the problem of reverse competition and paying for referrals. That's the issue here. With respect to the issue about the HUD-1 and my worded opponent's claim that somehow the second page of the HUD-1 is contradicted by the first, unfortunately he has misquoted the language of the statute under 2607d-2 because 2607d-2 doesn't talk about who paid for the settlement service. It says the person who is charged for it. And who is charged for it is determined by the HUD-1 by line 1108. And under federal law it has to reflect that accurately and it has to be signed by the buyer and seller. The fact that the buyer and seller may later have had some other economic transaction where they shifted around doesn't matter because they were charged for the amount on page 2 as shown in the HUD-1. That's what the statute says. The HUD-1 has to be an accurate record. It's required to be so by federal law. The other answer to the question is really one that was suggested by Judge Pranderson, which is if there are issues like this, you can resolve it at the remedy stage, you can resolve it at the discovery stage in terms of class certification if there are changes when this arises. With respect to the question of what's the damage here, the answer is that the injury is one created by Congress. And it is the right to participate in a real estate settlement where there is not a kickback or referral fee in the background. That's what the Third Circuit held in Alston. That's what the Sixth Circuit held in Carter v. Wells-Bowen. That's what Congress was trying to do. And the $2 million paid here was wholly unrelated to any services that were performed by First America, excuse me, performed by Tower City. There was an indivisible amount of consideration, $2 million, and they got that stock, but they also got back an exclusive referral agreement, and First America never denied that all of these transactions below or many of them had that in common. And the argument is made, well, it was due to the complaint. If you look at Judge Otero's order, page 15 of the record, Judge Otero said, I understand the plaintiff's argument that every single one of these agreements is identical in the following respect, that there was money paid for an exclusive referral agreement. He understood it. Mr. Stepanovich said, expressly, the only reason the money was paid was for the exclusive referral agreement. So there was no misunderstanding by the district court here. Instead, there was an error of law, even though we moved for class cert on an unexpressed basis. So for all of those reasons, we ask that the two orders denying class certification be reversed. If the case be remanded for unlimited discovery so that we can prove up what are considered to be common issues among the class. Thank you. Thank you. The matter is submitted. We'll take a brief recess.
judges: Fletcher B. , Pregerson, Graber